**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-00492-STV

ANDREW MARK LAMAR,

Plaintiff,

v.

RANDOLPH MAUL;
PAMELA DANG; and
LACY MONDAY,

Defendants.

---

**ORDER**

---

Magistrate Judge Scott T. Varholak

This matter comes before the Court on Plaintiff's Motion for Summary Judgment on Claim One ("Plaintiff's Motion") [#113] and Defendants' Rule 56 Motion for Summary Judgment ("Defendants' Motion") [#114] (collectively, the "Motions"). The parties have consented to proceed before a United States Magistrate Judge for all proceedings, including entry of a final judgment. [##25; 29] The Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions. For the following reasons, Plaintiff's Motion is **DENIED** and Defendants' Motion is **GRANTED**.

## I. BACKGROUND

This case arises out of various treatment Plaintiff experienced related to his medical needs while confined at Fremont Correctional Facility ("FCF"). [*See* #1] Plaintiff asserts two claims. First, he asserts a claim against Defendants Maul and Monday in their official capacities for violation of his Fourteenth Amendment Equal Protection rights. [*Id.* at 5-6] Second, he asserts a claim against Defendants Maul and Dang[1] in their individual capacities for violation of his Eighth Amendment right to adequate medical care. [*Id.* at 6-7]

Both parties have filed motions under Rule 56 of the Federal Rules of Civil Procedure seeking summary judgment in their favor. [##113; 114] Plaintiff seeks summary judgment on Claim One. [#113] Defendants seeks summary judgment on all Claims. [#114] Both Motions are fully briefed: Plaintiff's Motion [#113], Response to Plaintiff's Motion [#124], Reply to Plaintiff's Motion [#130]; Defendants' Motion [#114], Response to Defendants' Motion [#121], Reply to Defendants' Motion [#126]. This matter is thus ripe for disposition.

## II. UNDISPUTED MATERIAL FACTS[2]

At all times relevant to this case, Plaintiff was in the custody of the Colorado Department of Corrections ("CDOC"). [#115 at ¶ 1; *see also* #113 at ¶¶ 1, 3, 5] In the spring of 2023, Plaintiff experienced a knee injury. [##115 at ¶ 2; 113 at ¶ 2; *see also*

---

[1] The Court notes that Defendant Dang is deceased. [*See* #83] Prior to her death, Defendant Dang was able to respond to Plaintiff's interrogatories. [#114-18]

[2] Consistent with D.C.COLO.LCivR 56.1(1), Defendants' Motion includes a statement of material facts which set forth each party's proposed undisputed facts in sequentially numbered paragraphs. [#115] Plaintiff did not directly respond to these facts. [*See* #121] The material facts identified in this section are thus drawn from the summary judgment record and appear to be undisputed unless otherwise noted.

#114-1 at 27:20-28:1] Between July 2023 and February 2025, Plaintiff had several medical visits concerning his foot pain. [##115 at ¶ 3; 113 at ¶ 3; *see also* #113 at 14] On July 25, 2023, Plaintiff was seen by his facility's nursing staff after submitting a medical kite in which he asserted that he had various leg, foot, and mobility issues. [##115 at ¶ 4; 113 at ¶ 2]

What occurred during Plaintiff's various medical visits appears to be disputed by the parties. Plaintiff states that at least two providers informed him that "the need for a soft-soled shoe with arches would be recommended." [#113 at ¶ 4; *see also* #114-1 at 37:16-23] Plaintiff states that at least one provider determined that HOKA brand shoes would be most beneficial to Plaintiff's needs. [#113 at ¶ 6] Neither party provides evidence supporting this assertion, though the record does suggest that Plaintiff informed medical staff that he wanted HOKA shoes, and that the provider noted that such shoes would not be provided. [#116-3] Plaintiff additionally states that in December 2023, a medical provider recommended that the shoes be mailed to the facility from an approved third-party vendor, once approved by Defendants Maul and Monday and three other individuals.[3] [#113 at ¶ 9]

Defendants provide a different account of Plaintiff's medical visits. Defendants describe that during at least one of Plaintiff's visits, the attending nurse offered to treat Plaintiff's symptoms with Motrin, Tylenol, and an Ace wrap, which Plaintiff declined.[4]

[3] In Plaintiff's deposition, he stated that he "suggested" to a provider that he could potentially obtain medical shoes from a third-party vendor outside of the CDOC. [#114-1 at 23:15-24:6] Plaintiff stated that the provider "didn't have a response," "wasn't adverse to it," that "[s]he thought [it] was a good idea," and that she would reach out to Defendant Maul to seek approval. [*Id.* at 24:4-13]

[4] Plaintiff indicates that he does not recall refusing an Ace wrap but recalls disputing its efficacy. [#121 at ¶ 10] Medical records indicate that Plaintiff did not want to take Motrin

[#115 at ¶ 5] Later, Plaintiff reported to a medical professional that he had plantar fasciitis and that he had a benefactor outside of prison that would be willing to purchase a pair of shoes that a podiatrist previously recommended to the benefactor. [*Id.* at ¶ 6; *see also* #114-1 at 40:19-41:2; #116-1 at 4] The next day, Plaintiff declared a medical emergency and was seen by a nurse, who addressed his complaints of knee and foot pain by prescribing a knee sleeve and Motrin and Tylenol packets for discomfort. [#115 at ¶ 7] After two December 2023 visits, Plaintiff again saw a medical provider in February 2024 and informed her that he had submitted a request under the Americans with Disabilities Act ("ADA") for permission to purchase orthopedic shoes through his benefactor and to have them delivered to FCF. [*Id.* at ¶ 8; *see also* #114-1 at 72:19-73:1] Plaintiff stated that he would rather have his benefactor provide the shoes than undergo a consultation with the Prosthetic and Orthotic Group. [##115 at ¶ 9; 116-1 at 4] Plaintiff saw another provider twice in July 2024 and then asked his benefactor to purchase HOKA shoes for Plaintiff. [##115 at ¶ 10; 114-1 at 41:5-19] Plaintiff testified that he had spoken before with his benefactor about delivering the shoes from outside the prison. [##115 at ¶ 11; 114-1 at 42:20-43:3]

The parties also dispute, in some respects, what occurred after the HOKA shoes were ordered and delivered to FCF. The parties appear to agree that the CDOC denied Plaintiff's request for the shoes because he did not qualify for medical shoes under the clinical standards and procedures governing the issuance of healthcare appliances. [##113 at ¶¶ 1, 10; 115 at ¶ 15; *see also* #114-1 at 43:21-25, 55:24; #116-3] It appears

---

or Tylenol and that the provider "[o]ffered an ACE wrap, but [Plaintiff] [did] not want this either." [#116 at 5]

that the parties also agree that the request was simultaneously denied because the HOKA shoes did not pass security requirements as the thick soles could be used to hide contraband. [##115 at ¶¶ 15-16; 114-5 at 3; 114-1 at 70:16-23] Plaintiff indicates that when wearing the hard and flat state-issued boots and shoes he experienced problems such as plantar fasciitis, corns, numbness, erythema or ulcerations, and mobility issues. [#113 at ¶ 8] Plaintiff indicates that he was in pain, lost the ability to support his weight, and lost some range of movement. [*Id.*] Plaintiff explains that this was ongoing for a year and a half until he injured his knee. [*Id.*]

Defendants provide further information about occurrences relevant to this case in 2024 and 2025. In August 2024, Plaintiff received a communication from FCF indicating that the ADA Inmate Coordinator was looking into providing Plaintiff with orthopedic sneakers, but additional time was needed. [#115 at ¶ 17; *see also* #114-1 at 45:16-23, 63:19-25; #116-2 at 53] In October 2024, Plaintiff again received communication that he would be provided with shoes and that the ADA Team was awaiting approval. [#115 at ¶ 18; *see also* #116-2 at 38] In December 2024, Plaintiff was transferred to Sterling Correctional Facility ("SCF"). [#115 at ¶ 14; *see also* #114-1 at 11:12-25]

In March 2025, Plaintiff was informed that the ADA Inmate Coordinator's Office was willing to purchase a pair of Nortiv8 shoes for Plaintiff. [#115 at ¶ 19; *see also* #114-1 at 74:13-22; 116-2 at 52] In a memorandum accompanying this notice, Plaintiff was advised that Defendant Maul consulted with a podiatrist who recommended these shoes. [#115 at ¶ 19; 116-2 at 52] Plaintiff later declined these shoes and stated that he wanted the HOKA shoes. [#115 at ¶ 20; *see also* #114-1 at 86:16-87:21] Plaintiff's provider

indicated that she had not recommended any specific shoes to Plaintiff. [#115 at ¶ 21; *see also* #116-4]

Around July 2025, Plaintiff accepted the Nortiv8 shoes. [#115 at ¶ 23; #114-1 at 82:13-16] These shoes were permanently issued to Plaintiff in October 2025. [#115 at ¶ 24; *see also* #116-6] In December 2025, Plaintiff underwent an MRI of his left knee, which indicated the presence of chondromalacia in the medial and patellofemoral compartments of the knee. [##115 at ¶ 26; 114-1 at 29:20-25; 114-3 at 3, 11, 16; 116-5] Dr. Susan Tiona examined Plaintiff's medical records and determined that neither his claimed plantar fasciitis nor his left knee pain was caused by the state issued footwear, the fact that he did not receive the HOKAs, or any delay in providing Plaintiff with different shoes. [##115 at ¶ 27; 114-3 at 3-4, 17-18] Plaintiff disputes this conclusion, though he provides no contrary evidence. [#121 at ¶ 5] Dr. Tiona noted that the symptoms Plaintiff reported were not consistent with plantar fasciitis.[5] [##115 at ¶ 28; 114-3 at 12] Dr. Tiona found that Plaintiff's knee pain was caused by Plaintiff's chondromalacia patellae which itself was caused by "anatomic malalignment issues." [##115 at ¶ 29; 114-3 at 11, 18] Plaintiff also disputes this conclusion without providing contrary evidence. [#121 at ¶ 5]

The parties have provided the Court with information regarding the CDOC policy for providing inmates with medical shoes (the "HCA Standards"). [*See* #113 at 7-8] The policy states that medical shoes will be provided to offenders with: (1) foot deformities that prevent them from fitting into a standard shoe, (2) certain diabetic complications, (3) permanent appliances such as ankle braces that cannot fit into a standard shoe or boot,

[5] Dr. Tiona nevertheless noted that Plaintiff was diagnosed with plantar fasciitis during the course of his incarceration in the CDOC. [#114-3 at 10]

and (4) leg-length discrepancies requiring a built-up shoe to level out their gait. [*Id.* at 7; #115 at ¶ 31; #114-16 at ¶ 9] The policy states that plantar fasciitis is not a condition that qualifies an inmate for medical shoes. [##113 at 8; 115 at ¶ 30] Defendant Maul attests that "the HCA Standards serve as a guide for the CDOC's Clinical Services in ensuring that healthcare appliances are provided to [the] inmate population in a safe and equitable manner based on clinical necessity and priority." [#114-16 at ¶ 4]

Based on the language of the policy, Defendants indicate that Plaintiff did not qualify for medical shoes. [#115 at ¶ 30] Defendants explain that the CDOC's decision to limit access to medical shoes based on the nature of the inmate's condition is intended to allot limited resources to prioritize inmates with very serious podiatry issues. [*Id.* at ¶ 32; #114-16 at ¶ 10] When an inmate does not meet the HCA Standards, the inmate may still acquire orthotic footwear through two other means. [##115 at ¶ 34; 114-16 at ¶ 12] First, an inmate may purchase their own orthotics and/or podiatrist recommended Nortiv8 shoes that are available in the prison canteen. [##115 at ¶ 35; 114-16 at ¶ 13] Second, the inmate may request special orthotic shoes as a reasonable accommodation under the ADA. [##115 at ¶ 36; 114-16 at ¶ 14] If that request is approved, an inmate may receive such shoes at no cost. [#115 at ¶ 36; 114-16 at ¶ 14]

## III. STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "Cross-motions for summary judgment are treated as two individual motions for summary judgment and

held to the same standard." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019). "However, the summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial." *Stewart v. Am. Fam. Mut. Ins. Co., S.I.*, 744 F.Supp.3d 1198, 1200 (D. Colo. 2024). "A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim." *Id.* (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once this movant has met its initial burden, the burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "But 'if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies.'" *Id.* (quoting *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)). "A moving party who bears the burden at trial 'must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.'" *Id.* (quoting *Pelt*, 539 F.3d at 1280).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 248-49; *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment "must be based on more than mere speculation, conjecture, or

surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). In reviewing a motion for summary judgment, the Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). "The *Haines* rule applies to all proceedings involving a pro se litigant." *Id.* at 1110 n.3. The Court, however, cannot be a pro se litigant's advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008). Moreover, pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (quoting *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992)).

## IV. ANALYSIS

### A. Claim One

Plaintiff argues that he is entitled to summary judgment on Claim One because the HCA Standard at issue permits inmates with certain diagnoses to receive medical shoes but prevents inmates with other diagnoses from doing so. [#113 at ¶ 12] Plaintiff argues

that the diagnosis categories are an arbitrary and discriminatory distinction in violation of the Fourteenth Amendment. [*Id.* at ¶ 13] Defendants also argue that they are entitled to summary judgment on Claim One. [#114 at 4-13] In particular, Defendants contend that Claim One is moot because Plaintiff has already been accommodated, that the HCA Standards do not run afoul of the Equal Protection Clause, and that Plaintiff's request contravenes the Prison Litigation Reform Act ("PLRA") because it is overbroad. [*Id.*]

Because it is jurisdictional, the Court begins by addressing Defendants' mootness argument. A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A claim may become moot if: "(1) it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* (quotations and internal citations omitted). The "burden of demonstrating mootness 'is a heavy one.'" *Id.* (citing *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)).

Defendants do not argue that the HCA Standards relevant to this case are no longer in effect. Rather, Defendants argue that Plaintiff's claim is moot because the CDOC's ADA Inmate Coordinator Office has since purchased Plaintiff a pair of Nortiv8 shoes as a reasonable accommodation for his pain. [#114 at 6-7] Thus, Defendants argue that the only relief Plaintiff could obtain under this Claim has already been provided. [*Id.* at 7]

Plaintiff requests equitable relief in the form of "nullifying" the relevant HCA Standards. [#1 at 8] "Where a plaintiff requests equitable relief, a mere showing that he

maintains a personal stake in the outcome of the controversy is insufficient." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). "Rather, a plaintiff must additionally demonstrate 'an adequate basis for equitable relief'—that is, '[a] likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)) (emphasis omitted). "Where a plaintiff seeks an injunction, his susceptibility to continuing injury is of particular importance—'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Id.* (quoting *O'Shea*, 414 U.S. at 495-96) (emphasis omitted). "Moreover, a plaintiff's continued susceptibility to injury must be reasonably certain; a court will not entertain a claim for injunctive relief where the allegations 'take it into the area of speculation and conjecture.'" *Id.* (quoting *O'Shea*, 414 U.S. at 497) (cleaned up).

One exception to the doctrine of mootness is "conduct capable of repetition yet evading review." *Robert v. Austin*, 72 F.4th 1160, 1164 (10th Cir. 2023) (citing *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015)). "Under this exception, which courts reserve for exceptional situations, issues under review are not moot if they (1) evade review because the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) are capable of repetition, such that there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Id.* at 1164-65 (*Fleming*, 785 F.3d at 445).

The Court finds that the evidence on the record suggests that the issue is not moot. It is true that Plaintiff was "permanently issued" the Nortiv8 shoes approximately one year

ago. [#116-6] However, a pair of shoes do not last forever. And, in fact, the record suggests that Plaintiff may be facing life in prison. [*See, e.g.*, ##114-13 at 3; 114 at 2] Even in the event that Plaintiff is removed from CDOC custody following his next parole hearing, Plaintiff's next parole hearing is not until April 2027. [*See* #126 at 4] Accordingly, Plaintiff will certainly be subjected to the policy at issue for six months longer, at a minimum. And even by the next parole date, Plaintiff's shoes will be approximately 21 months old. [#115 at ¶ 23; 114-1 at 82:13-16]

And there is a reasonable expectation that Plaintiff will be subjected to the same action again. Plaintiff remains in CDOC custody and will remain there for, at a minimum, six more months and, at a maximum, the rest of his life. While Plaintiff has been issued one pair of shoes, it does not appear from the record that he will be issued another, as he was explicitly informed that this was a one time courtesy. [#116-2 at 54] Plaintiff's shoes will certainly wear out. And Defendants' expert opines that Plaintiff's pain is caused, at least in part, by his own anatomy. [#114-3 at 18] These anatomical issues are not surgically correctible. [*Id.* at 16] Accordingly, the record reflects that Plaintiff will continue to experience the same pain for which he sought medical shoes while Plaintiff is in custody. Therefore, it is reasonable to expect that Plaintiff will again seek medical shoes while in custody and will again be denied such shoes under the HCA Standards. Accordingly, the Court finds that Plaintiff's claim is not moot.

Next, the Court addresses the parties' arguments related to Equal Protection. The Fourteenth Amendment states that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. But the Fourteenth Amendment "must coexist with the practical

necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *U.S. v. Skrmetti*, 605 U.S. 495, 509 (2025) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). Accordingly, "if a law neither burdens a fundamental right nor targets a suspect class, [a court must] uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* at 510 (quoting *Romer*, 517 U.S. at 613). While some classifications such as those made on the basis of race are subject to heightened scrutiny under the Equal Protection Clause, classifications on the basis of medical use are subject to rational basis review. *Id.* at 510-11. For example, a piece of legislation that permits individuals with certain medical disorders or conditions to be treated in one manner but prohibits that same treatment for individuals with other disorders or conditions is subject to rational basis review. *Id.* at 511. "Under [the rational basis] standard, [a court must] uphold a statutory classification so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 522 (quotation omitted).

But prison regulations are treated differently than legislation under the Fourteenth Amendment. "[A] prison regulation imping[ing] on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests." *Rojas v. Heimgartner,* 604 F. App'x 692, 694 (10th Cir. 2015) (quoting *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 349 (1987)). This standard arises because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative

and executive branches of government." *Id.* at 84-85. Courts thus are tasked with exercising judicial restraint when addressing constitutional claims brought by incarcerated parties, especially where such claims involve a state penal system. *Id.* at 85. The United States Supreme Court has therefore identified four factors that are relevant to determining the reasonableness of the prison regulation at issue:

> (1) whether a valid and rational connection exists between the regulation and a legitimate governmental interest advanced as a justification; (2) whether, notwithstanding the regulation, alternative means exist for the prisoner to exercise the right; (3) what effect an accommodation of the prisoner's constitutional right would have on guards, inmates and prison resources; and (4) whether an alternative is available which would accommodate the prisoner's rights at a de minimis cost to valid penological interests.

*Patel v. Wooten*, 15 F. App'x 647, 650-51 (10th Cir. 2001) (citing *Turner*, 482 U.S. at 89-91).

Applied here, Defendants have shown that the HCA Standards at issue are motivated by the legitimate governmental interest of allotting limited resources to prioritize inmates with serious health concerns. [#114-16 at ¶ 10] There is a rational connection between the regulation and this goal: the regulation provides medical shoe access to certain conditions that prison officials have deemed to be more severe than other conditions. Prioritizing severe conditions over comparatively less severe conditions when there are limited resources is not irrational. The Court recognizes that lines must be drawn somewhere, and that prison administrators have greater expertise in this area and are thus better suited than courts to make distinctions as to which conditions should be prioritized. Plaintiff has provided no evidence that the distinction present in the HCA Standards was either arbitrary or unrelated to a legitimate government interest.

Additionally, the record shows that Plaintiff had an alternative means of obtaining orthotic shoes. [#115 at ¶¶ 34-36; 114-16 at ¶¶ 12-14] Specifically, Plaintiff had the alternative means of: (1) purchasing orthotics or podiatrist recommended Nortiv8 shoes or (2) requesting the orthotic shoes as a reasonable accommodation under the ADA. [*Id.*] Indeed, Plaintiff did receive such shoes at no cost by pursuing the ADA accommodation. [##115 at ¶¶ 23-24; 114-1 at 82:13-16; 116-6] Accordingly, Plaintiff has provided no evidence supporting that he had no alternative means of obtaining the shoes.

Plaintiff's request that the CDOC cease prioritizing certain foot conditions when providing medical footwear would necessarily impact prison resources. The Court is not in the best place to make judgments as to where prison resources are best spent; this is a function better performed by prison officials. Such prison officials state in pleadings that "requiring the CDOC to furnish medical shoes to *every* inmate with *any* kind of foot condition would put a significant strain on its resources." [#114 at 11 (emphasis in original)] And Plaintiff has provided no evidence that his request would have any lesser impact.

Finally, the record shows that while an alternative avenue of receiving orthotic shoes was available at a de minimis cost to valid penological interests, this alternative avenue (the ADA accommodation request) was made available to inmates—Plaintiff successfully pursued it. [##115 at ¶¶ 23-24; 114-1 at 82:13-16; 116-6] Accordingly, Plaintiff has provided no evidence that the HCA Standards run afoul of Equal Protection.[6]

---

[6] To the extent Plaintiff objects to the fact that he received Nortiv8 shoes rather than HOKA shoes due to security concerns, "judgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their

For this reason, the Court GRANTS summary judgment in Defendants' favor as to Claim One and DENIES Plaintiff's Motion.[7]

### B. Claim Two

Defendants also argue that they are entitled to summary judgment as to Claim Two. [#114 at 13-20] Plaintiff's theory of Defendant Dang and Defendant Maul's liability as to Claim Two is premised upon the allegation that both of these individuals participated in denying Plaintiff's request to receive the HOKA shoes that were delivered to his facility. [#1 at 7] The Court addresses the claim against each Defendant in turn.

Defendants argue that there is no evidence that Defendant Dang was involved in the decision to deny Plaintiff's request. [#114 at 15] "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). "Supervisory status alone does not create § 1983 liability." *Id.* (citing *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)). "Rather, there must be 'an affirmative link . . . between the constitutional deprivation and either the

---

expert judgment in such matters.'" *Turner*, 482 U.S. at 86 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). There is no evidence in the record that Defendants exaggerated their response to security concerns. While the record suggests that one other prisoner may have obtained HOKA shoes at some point [*see, e.g.*, #114-1 at 60:20-22], the Court has no information regarding the specific type of shoes Plaintiff sought and those the other individual allegedly received, or how their lower body conditions may have differed. Plaintiff explains that Nortiv8 shoes are also thick, but that they "have holes running through." [*Id.* at 87:17-21] Though Plaintiff may wish that FCF had "notched" the HOKAs or that medical personnel simply were required to examine them from time to time, Plaintiff has no constitutional right to such an accommodation, particularly where there is no evidence in the record to suggest that the Nortiv8 shoes are any less effective at treating Plaintiff's condition than the HOKAs. [*See id.* at 85:22-87:11] Accordingly, the evidence on the record does not support that Defendants exaggerated their response to security concerns by providing Nortiv8 shoes rather than HOKAs.

[7] The Court therefore need not reach Defendants' arguments concerning the PLRA.

supervisor's personal participation, his exercise of control or direction, or his failure to supervise.'" *Id.* (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)).

There are no facts on the record which suggest that Defendant Dang had any involvement with the decision to deny Plaintiff's request for the HOKAs. Defendant Dang indicated that at the time of the allegations of the Complaint, she was working as a "Nurse 3" which was a nursing supervisor. [#114-18 at 3; *see also* #114-1 at 16:11-12] The Court has been provided with no evidence, administrative regulations or otherwise, indicating that an individual in the position of Nurse 3 would have authority to approve or deny medical shoe requests. The record suggests that Correctional Health Partners ("CHP") approves orthopedic shoes, and Defendant Dang was neither part of nor in contact with this group. [#114-1 at 43:21-25; 114-16 at ¶ 11; 114-18 at 3, 5; *see also* #113 at 15 (indicating that Plaintiff's request for medical shoes was denied by CHP)]

In fact, Defendant Dang indicated that she informed Plaintiff that she "did not have any say regarding who could approve [the HOKAs] or who would deny them." [#114-18 at 2] Furthermore, Defendant Dang stated that she was not involved in the approval or denial process for the shoes and had never been asked to approve a similar request in the past. [*Id.* at 3] While Plaintiff stated that he thought "she may have been in the position to make a decision" and that Defendant Dang was "reaching out to . . . [Defendant] Maul" [#114-1 at 16:22-25], there is no evidence on the record supporting these assertions. Plaintiff responded to Defendants' Motion, which explicitly identified this concern. [#121] Nevertheless, as to Defendant Dang, Plaintiff again failed to provide any evidence that Defendant Dang was involved in denying Plaintiff's shoes and merely stated that Defendant Dang "could have taken action . . . by simply approving the shoes."

[*Id.* at ¶ 12] Plaintiff has thus failed to provide any evidence of Defendant Dang's personal participation in his alleged constitutional deprivation, which is an essential element of a Section 1983 claim. For this reason, the Court GRANTS summary judgment as to Defendant Dang on Claim Two.

There is slightly more evidence of Defendant Maul's involvement with the decision to deny Plaintiff's request for the HOKAs. For example, Plaintiff provides evidence that Defendant Maul received an email from an attorney asking if he could assist Plaintiff in getting access to the HOKAs on July 26, 2024. [*See* #121-2 at 4] Defendant Maul responded by directing the attorney to the facility Health Services Administrator, stating that this individual should be able to handle the request.[8] [*Id.*] Defendant Maul also acknowledges receiving emails regarding Plaintiff's request. [#114-5 at 2]

Defendant Maul stated that he "received no order from anyone to deny the shoe request." [*Id.* at 3] Furthermore, Defendant Maul stated that the CDOC's medical contractor, CHP, makes a final determination whether to approve an inmate for medical shoes. [#114-16 at ¶ 11] Nevertheless, Defendant Maul admits that he signs all clinical guidelines as Chief Medical Officer of the CDOC. [#114-5 at 4] Such guidelines include the HCA Standards under which, in part, Plaintiff's request for the HOKAs was denied. [#114-16 at ¶¶ 2-9] Though Plaintiff's shoes were also denied due in part to safety concerns, it appears that the HCA Standards were an independent reason for denial.

[8] One might say that this response tends to support the conclusion that Defendant Maul did not deny the request for the HOKAs. Defendant Maul never indicated that he denied the request, nor that he was personally looking into the request. There is no evidence that Defendant Maul supervised or controlled any of the decision-makers related to this request. The evidence before the Court simply suggests that Defendant Maul was regularly in contact with CHP in his position as Chief Medical Officer. [#114-17 at 5]

Accordingly, Plaintiff has sufficiently shown that Defendant Maul personally participated in the alleged indifference to Plaintiff's medical needs. *See, e.g.*, *Langford v. Grady Cnty. Det. Ctr.*, 670 F. Supp. 2d 1213, 1239 (W.D. Okla. 2009) (finding that a defendant jail administrator personally participated in an alleged deprivation of medical care where the medical care was denied pursuant to jail policy).

Defendants also argue that there is no genuine factual dispute as to whether Defendant Maul consciously disregarded a substantial risk of serious harm to Plaintiff's health and safety. [#114 at 15-17] The United States Supreme Court has stated that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation omitted). Prison personnel "may thus be liable under § 1983 for 'indifference . . . manifested . . . in their response to the prisoner's needs or by . . . intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed.'" *Est. of Booker v. Gomez*, 745 F.3d 405, 429 (10th Cir. 2014) (quoting *Estelle*, 429 U.S. at 104-05).

"[D]eliberate indifference entails something more than mere negligence." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1154 (10th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "But 'it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). "'[W]hen prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment,' they may be liable for deliberate indifferent." *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000)).

"The contours of constitutional liability under the deliberate-indifference standard are familiar: there is both an objective and a subjective component." *Id.* (quoting *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022)). "The objective component focuses on the 'seriousness of the plaintiff's alleged harm,' and the subjective component focuses on 'the mental state of the defendant with respect to the risk of that harm.'" *Id.* at 1154-55 (quoting *Prince v. Sherriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022)). The Tenth Circuit has held that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock*, 218 F.3d at 1209). "The subjective component is satisfied if the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Id.* (citing *Farmer*, 511 U.S. at 837).

The Court agrees with Defendants that there is no evidence in the record that Defendant Maul, through the HCA Standards, acted in a way that meets the deliberate indifference standard. The record suggests that the HCA Standards denied Plaintiff one specific mode of treatment: that of receiving automatic approval for medical shoes on the basis of his condition alone. Nevertheless, Plaintiff was entitled to seek Nortiv8 shoes as an ADA accommodation and successfully did so. [#116-6]

Moreover, a plaintiff has not successfully asserted an Eighth Amendment claim where their assertions "amount[ ] only to a difference of opinion as to the need for medical . . . treatment or the adequacy of any treatment." *Scott v. Gibson*, 37 F. App'x 422, 423

(10th Cir. 2002) (citing *Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993)). And that is what the record demonstrates occurred here. As early as 2023, the record demonstrates that Plaintiff was looking to buy or receive medical shoes. [#116 at 1] At that time, Plaintiff was offered Motrin, Tylenol, and an ACE wrap to alleviate his symptoms, but he declined these forms of treatment. [*Id.* at 5] There is no evidence on the record that these forms of treatment would have been ineffective or inadequate. A few months later, Plaintiff again visited medical personnel claiming similar symptoms to his prior visit. [#116-1 at 4] Plaintiff stated that an individual outside of the prison would purchase orthotics and that Plaintiff had sent a letter to the facility's ADA Coordinator requesting an accommodation of this nature.[9] [*Id.*] The record suggests that a consultation related to the medical shoes was discussed at this appointment, but Plaintiff "prefer[red] to skip this step and ha[d] sent [a] letter to [the] ADA Coordinator." [*Id.* at 5] Thus, it appears that Plaintiff was seeking a particular form of treatment based on his own opinion as to the adequacy of the medical treatment he was being provided.

Plaintiff again visited medical staff in early 2025, where the provider indicated that Plaintiff wanted HOKA shoes but that such shoes would not be provided and that Plaintiff failed to provide a different brand. [#116-3] The provider noted that Plaintiff had not been approved for medical shoes by CHP, but that he was approved one pair of tennis shoes for his plantar fasciitis. [*Id.*] Again, there is no evidence on the record that the tennis shoes would have been ineffective or inadequate to treat his medical issues. When Plaintiff visited medical staff again approximately a month later, the provider noted that

---

[9] The record reflects that Plaintiff reached out to the ADA Coordinator on several occasions throughout 2024 and 2025. [*See* #116-2]

Plaintiff had been offered a pair of tennis shoes, but that Plaintiff wanted HOKAs because he claimed that providers had specifically recommended these shoes. [#116-4 at 2] The provider proceeded to inform Plaintiff that "this provider does not recommend any specific shoes." [*Id.*] Though the notes from the medical visit are not entirely clear, they appear to indicate that Plaintiff did not make any decisions regarding whether he would accept a different brand of shoes. [*Id.*]

Thus, the record demonstrates that Plaintiff's second Claim is premised on his inability to pursue a particular course of treatment which was not permitted or recommended by FCF medical and safety personnel. Plaintiff was offered various other forms of treatment, which he often declined, and yet there is no evidence on the record that the forms of treatment Plaintiff was offered would have been inadequate to treat his concerns. Additionally, there is no evidence on the record that the Nortiv8 shoes Plaintiff eventually received were any less effective at treating his condition than the HOKAs Plaintiff sought would have been. And "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)). Accordingly, Defendant Maul is entitled to summary judgment on Plaintiff's second claim.

Defendants are also entitled to summary judgment on Plaintiff's Second Claim under the doctrine of qualified immunity. [#114 at 19-20 (Defendants' raising a qualified immunity defense)] "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). Once the defense of qualified immunity has been raised, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). As Plaintiff has not shown that Defendant Dang or Defendant Maul violated a statutory or constitutional right, both Defendants are entitled to qualified immunity. Additionally, Plaintiff has not established that the right at issue here—to be prescribed medical shoes and/or a particular type of shoe for plantar fasciitis when other forms of recommended treatment were refused—was "clearly established." Accordingly, the Court GRANTS Defendants' Motion as it pertains to Claim Two.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion [#113] is **DENIED** and Defendants' Motion [#114] is **GRANTED**. Summary judgment is **GRANTED** in favor of Defendants as to all Claims.

DATED: October 1, 2026

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge